

# NUMBER 13-16-00347-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

LUIS ARMANDO CARREON,                                        Appellant,

v.

THE STATE OF TEXAS,                                          Appellee.

On appeal from the 389th District Court
of Hidalgo County, Texas.

# OPINION

**Before Chief Justice Valdez and Justices Contreras and Hinojosa
Opinion by Justice Hinojosa**

Luis Armando Carreon appeals from a judgment revoking community supervision for failure to pay community supervision fees, court costs, a fine, and restitution, and sentencing him to four years' confinement. In four issues, Carreon argues that the trial court abused its discretion by revoking community supervision on the grounds that: (1)

the evidence does not establish one of the alleged violations; (2) the evidence establishes that Carreon lacks the ability to pay; (3) the community supervision terms contained contrary provisions ordering Carreon to both support his family with his earnings and requiring him to spend all his earnings to pay restitution, fines, fees, and costs; and (4) the trial court was biased.   We reverse and render.

## I. BACKGROUND

On April 17, 2006, pursuant to a guilty plea, the trial court convicted Carreon on two counts of burglary of a habitation, both second degree felonies.   *See* TEX. PENAL CODE ANN. § 30.02(c)(2) (West, Westlaw through 2017 1st C.S.).   On the only count that is the subject of this appeal, the trial court sentenced Carreon to ten years' confinement, suspended the sentence, and placed Carreon on community supervision for ten years. The judgment ordered Carreon to pay $23,107.36 in restitution,[1]  $347.00 in court costs, and a $750.00 fine.[2]

On February 24, 2016, the State moved to revoke Carreon's community supervision, alleging that Carreon violated four community supervision terms by failing to pay $3,223.00 in monthly community supervision fees, $30.00 in court costs, a $750.00 fine, and a delinquent sum of $23,709.36 in restitution.

At the initial hearing on the motion to revoke, Carreon's counsel asserted that he lacked the ability to pay the restitution.   The State recommended that Carreon be

---

[1] The record before us does not explain how the trial court calculated the $23,107.36 in restitution. As noted below, the victims failed to testify at the revocation hearing.   Thus, there was no evidence before the trial court as to how the restitution amount was calculated.

[2] The other burglary count, which is not the subject of this appeal, ended in a similar judgment, but the restitution amount was approximately $2,828.36.   As explained below, Carreon paid this amount.

confined for two years, to which the trial court responded, "That's not going to happen either. That's ridiculous, okay? I wouldn't even accept that plea bargain, okay? Give the minimum because it's the minimum. That's ridiculous. Now you know where I am. Either go to trial or go to trial. That's pretty much it." The motion was set for an evidentiary hearing the following day.

At the evidentiary hearing, the State moved to dismiss the motion to revoke because it believed that it lacked sufficient evidence. Specifically, the State asserted that it lacked evidence of the considerations outlined in article 42.037(h) of the Texas Code of Criminal Procedure. TEX. CODE CRIM. PROC. ANN. art. 42.037(h) (West, Westlaw through 2017 1st C.S.). Despite the State's concession regarding its lack of evidence, the trial court denied the State's motion to dismiss the motion to revoke, responding:

> Okay. So when—please make that record because if the victim comes back at me for the State's failure to even try the case, I will show that record to the victim and say, [t]alk to your DA because the State is failing to even try the case.
>
> . . . .
>
> I'm not dismissing it. I'm going to make you go to trial.
>
> . . . .
>
> That's all I can tell you. Now, do your job. Now, I can't make you call witnesses, but I can certainly make you go to trial and I'm not dismissing it.

Having no choice, the State called Carreon's current and previous probation officers, Crystal Garcia and Anna Lisa Sanchez,[3] respectively. The State did not call any other

---

[3] Sanchez was called to identify Carreon. Her testimony is not relevant to our disposition and need not be detailed. See TEX. R. APP. P. 47.1.

3

witnesses, such as the complainant to whom restitution was owed. Carreon called himself and his wife, Erica Carreon.[4]

## A.    Garcia

Garcia recounted that during Carreon's ten-year supervisory period, he was not arrested, he tested negative for drugs, and he attended the mandatory monthly meetings or timely rescheduled them. Garcia testified that the accounting department in the probation office determined how Carreon's restitution payments were credited as between the underlying burglary conviction and the other burglary conviction. As a result of the accounting department's allocations, Carreon paid all of the restitution ordered in the conviction stemming from the other count. On the other hand, Carreon paid no money towards restitution in the underlying conviction from 2007 through 2010. With the exception of 2016, Carreon's payments towards restitution in the underlying conviction in the other years were minimal.[5] In 2016, with the help of family and after being jailed for failure to pay restitution, Carreon paid $2,166.00. Garcia could not explain why the accounting department in the probation office credited Carreon's restitution payments as it did. On examination by the trial court, Garcia admitted that she failed in her duties by not creating a monthly budget for Carreon.

## B.    Carreon

Carreon testified he was placed on community supervision at eighteen years old,

---

[4] We will refer to Erica Carreon by her first name.

[5] For the other years, Carreon paid $42.00 in 2006, $38.00 in each year from 2011 through 2013, $60.62 in 2014, and $56.00 in 2015. According to our calculations, Carreon paid a total of $2,438.62 towards restitution in the underlying proceeding. The record is unclear was to why the State asserted that Carreon still owed $23,709.36, more than the original amount of restitution ordered.

and he had not previously worked. Carreon had no car, and he, Erica, and their infant son lived with Erica's parents in a three-bedroom trailer. Carreon's first job out of jail was selling newspaper subscriptions door-to-door. It paid on commission, and it allowed Carreon to work only three hours in the evening. Carreon's earnings were approximately $150.00 every two weeks and his supervisor, who drove him to work, eventually stopped transporting him.

After the subscription sales job, Carreon enrolled in a government program that matched probationers with employers. He worked at a fast-food restaurant until he was laid off. Through a different government program, Carreon earned a GED. He then pursued a "degree"[6] in "computer accounting" from a vocational school, but he incurred approximately $17,000 in student loan debt. As a result, Carreon's tax refunds are now garnished to pay his outstanding student loan.

Even with some education in accounting, Carreon claimed it was difficult for him to obtain and maintain steady work. Some employers were reluctant to interview, further screen through a call back interview, or hire a convicted felon. When Carreon was hired, the monthly probation meetings bothered most of his supervisors. Carreon's attempt to work in out-of-state oilfields was stymied by the probation office's prohibition on such travel, and the only in-state oilfield job he obtained ended when the employer learned of Carreon's criminal record.

Generally, Carreon posited that his status as a convicted felon posed an insurmountable obstacle to his employment prospects. At this point in Carreon's

---

[6] Carreon did not specify the type of "degree" he received.

5

testimony, the trial court questioned Carreon directly, as follows:

COURT: Okay. And you're telling me that people care about whether you have a criminal background if you're picking onions? You're telling me that you couldn't get a job picking onions or watermelon or cantaloupe or lettuce or anything? You're telling me that?

CARREON: Well, who would drive me there, Your Honor? I don't have a car.

COURT: Where did you say you lived?

CARREON: Monte Cristo and Conway.

COURT: Monte Cristo is—would that be safe to say, there's a lot of farmland around there? Orchards too. Would that be safe to say?

CARREON: Yeah, but the places where they hire is not there. It's just the field.

COURT: Did you ever show up to one of the fields and say, Hey, do you have work available? Did you ever do that? Just around your area, walking area where there's farmland. You didn't answer the question. Is there farmland and orchards around where you live?

CARREON: There's one, Your Honor.

COURT: Walking distance?

CARREON: It's like, two miles, yeah.

COURT: Walking distance?

CARREON: Oh, no, not walking distance.

COURT: You don't think two miles is walking distance? Not for you. Did you ever try to go to the—to that farmland and see if you could get a job?

CARREON: No, Your Honor.

6

COURT:     Why?

CARREON:   Because I was putting applications somewhere else, calling.

COURT:     You weren't working.  You weren't working for most of the time you were on probation, so why wouldn't you try that?

CARREON:   I guess it didn't occur to me to go ask the farmland for a job.

COURT:     Would it be safe to say because you just didn't want to do that kind of work?

CARREON:   No, it just didn't occur to me.

COURT:     Okay.

This exchange exposed another employment impediment—a lack of transportation.  Due to a lack of transportation, Carreon pursued work near his home. Carreon mowed neighbors' yards for approximately $20.00 a yard.  On the occasions when he was needed, Carreon worked for his father, a mechanic, and his uncle, a painter; these jobs paid approximately $100.00 a week.

Carreon also claimed to be bipolar.  He recalled that his mother took him to a mental health facility when he was fifteen years old.  There, Carreon spoke with a psychiatrist.  According to Carreon, the psychiatrist said "it wasn't that bad so [he] can be processed and take medication for it."  When asked by the trial court, Carreon denied ever being diagnosed with a mental illness by the psychiatrist.

## C.     Erica

Erica testified that she managed the family's finances.   Carreon and Erica cashed his paychecks together, and Carreon did not hide money from her.   Erica confirmed that the couple does not own a car and that she, Carreon, and their three children live with

her parents and sisters in a three-bedroom trailer.

## D.     The Trial Court's Ruling

After hearing from Erica, the trial court recessed to allow counsel to present

additional authority and prepare closing arguments.   The following day, after the

arguments of counsel, the trial court granted the State's motion to revoke.   It noted,

> The thing about it is logically, you pay in installments because most people cannot pay $10,000 in one lump sum, which was evident by Mr. Carreon. Now, during the course of his probation, I did take note that he completed his conditions of probation except for the four that are on this Motion to Revoke.   But that doesn't discount that they're as important as every other condition.   And just because he didn't—he completed all the others, you don't get a pass.
>
> If you look at the *Bearden* case,[7] the thing about the *Bearden* case is that in that particular case, the judge gave a person a small span of time to pay certain things and he didn't and then revoked him and sentenced him and didn't think about any alternative measures.   Well, in this case, Mr. Carreon was given every single opportunity to pay.   He was responsible to pay and he was—his failure to pay was also his responsibility.   He willfully failed to pay.   And I note that on multiple years in this case, he didn't pay anything to restitution.   Zero.   But think about this, no one ever filed a Motion to Revoke against him.   They worked with him for ten years.
>
> Now, you want to say that that's the probation department, they never brought it to my attention, they brought it to his attention that he needed to pay.   And he willfully on one, two, three, four, at least four years didn't pay anything to restitution, zero and he was on probation ten years.   I did not have testimony for ten consecutive years that what he did, whether he actually tried.
>
> I did note this, that he thought walking two miles was just too much to go to a farm or anything to go pick anything, but he was able to get to school when he needed to get to school.   That was important to him.   He didn't miss that.   I didn't have any testimony he missed school.   What I did note, there is no adequate form of punishment that I can—that I can do.   I can't extend him anymore.   It's been ten years.
>
> So I'm finding that he's wilfully refused to pay restitution and has failed to

---

[7] *Bearden v. Georgia*, 461 U.S. 660 (1983)

make sufficient bona fide efforts to seek employment or borrow money to pay. As a matter of fact, what I noted is every time—on the case that you described, the prior one, the only reason that case got dismissed is because he paid off restitution and that was the deal. That was the deal. So he was real willing to come up with restitution when his feet were to the fire. Now we're at ten years and well, there's nothing more that I can do. I can't work with him on probation anymore. It's done.

So I'm making a finding he willfully refused to pay restitution on multiple years and failed to make sufficient bona fide efforts to seek employment. Going to make applications is one thing, but making every effort, every single day to go out and find something to do and work, there's no testimony of that. So I'm indicating that he has willfully made himself underemployed or unemployed.

He didn't make sufficient efforts to find employment or to borrow money. He has had ample opportunity in the last ten years to do this. He has had ten years to pay and on multiple years as I said, chose not to pay either minimum balance or nothing. He can't say that people—the probation didn't work with him. They did.

He has demonstrated a lack of regard for what was probably one of the most important things on that probationary judgment: Restitution, to make a victim whole. And that is a debt that he owes society and he had a total lack of regard for it.

So I'm making a finding based on—and if you look at—if you actually look at 42.037, I have looked at his employment status and found that he is either willfully unemployed or underemployed. I've looked at his current future earnings. If you are willfully underemployed or unemployed because you choose that, without really making every single effort to try to find employment, then you're not going to have any future earnings.

Carreon appeals from the trial court's judgment. The State has not filed a responsive brief.

## II. Discussion

In his second issue, advanced in two sub-issues, Carreon argues that the trial court abused its discretion in revoking his community supervision because the evidence shows that he lacked the ability to pay. In the first sub-issue, Carreon challenges the legal

9

sufficiency of the evidence supporting the statutory elements related to the revocation of community supervision for failure to pay restitution. *See* TEX. CODE CRIM. PROC. ANN. art. 42.037(h) (West, Westlaw through 2017 1st C.S.). In the second sub-issue, Carreon asserts that it "is unconstitutional to jail someone for poverty." While Carreon's first sub-issue relates to only the restitution ground, his second sub-issue relates to all of the revocation grounds, including restitution, community supervision fees, fines, and courts costs.

**A.    Sub-Issue One:    The Legal Sufficiency Challenge**

**1.    Standards of Review**

We review the trial court's order revoking community supervision for an abuse of discretion. *Hacker v. State*, 389 S.W.3d 860, 865 (Tex. Crim. App. 2013). The test for abuse of discretion is not whether, in the opinion of the appellate court, the facts present a suitable case for the trial court's action, but rather, whether the trial court acted without reference to any guiding rules or principles. *State v. Thomas*, 428 S.W.3d 99, 103 (Tex. Crim. App. 2014).

In Carreon's first sub-issue, he asserts that the trial court was presented with legally insufficient evidence to support revocation; and the trial court thereby abused its discretion by revoking Carreon's community supervision. When evaluating a legal sufficiency challenge, we view the evidence in the light most favorable to the factfinder to determine whether it could make the findings that were returned. *See Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (plurality op.) (detailing the legal sufficiency standard for reviewing a jury's verdict); *see also Jackson v. Virginia*, 443 U.S. 307, 319,

(1979).   In this case, the evidentiary standard is by a preponderance of the evidence.  *See Rickels v. State*, 202 S.W.3d 759, 764 (Tex. Crim. App. 2006) (providing that a trial court may revoke community supervision if the State proves by a preponderance of the evidence that the defendant violated a condition of community supervision as alleged in the motion to revoke).   Preponderance of the evidence means "that greater weight of the credible evidence which would create a reasonable belief that the defendant has violated a condition" of his community supervision.   *Id.* at 763–64.   The factfinder is the sole judge of the credibility of the witnesses and the weight to be given to their testimony, and we may not substitute our judgment as to facts for that of the factfinder as shown through its findings.   *See Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012).   When we are faced with a record supporting contradicting inferences, we must presume that the factfinder resolved any such conflict in favor of its findings, even if it is not explicitly stated in the record.   *See id.*

### 2.      Applicable Law

Article 42.037(h) of the Texas Code of Criminal Procedure provides,

> If a defendant is placed on community supervision or is paroled or released on mandatory supervision, the court or the parole panel shall order the ***payment of restitution*** ordered under this article as a condition of community supervision, parole, or mandatory supervision.   The court ***may*** revoke community supervision and the parole panel may revoke parole or mandatory supervision if the defendant fails to comply with the order.   In determining whether to revoke community supervision, parole, or mandatory supervision, the court or parole panel ***shall consider***:

> (1)     the defendant's employment status;

> (2)     the defendant's current and future earning ability;

> (3)     the defendant's current and future financial resources;

11

(4)    the willfulness of the defendant's failure to pay;

(5)    any other special circumstances that may affect the defendant's ability to pay; and

(6)    the victim's financial resources or ability to pay expenses incurred by the victim as a result of the offense.

TEX. CODE CRIM. PROC. ANN. art. 42.037(h) (emphasis added).

In *Bryant v. State*, the court of criminal appeals synthesized article 42.037(h)'s discretionary provision, which provides that the court "may revoke community supervision" if the defendant fails to comply with the order of restitution, with its evidentiary provision, which provides that the court "shall consider" six factors. 391 S.W.3d 86, 93 (Tex. Crim. App. 2012) (citing TEX. CODE CRIM. PROC. ANN. art. 42.037(h)). The court concluded that "as long as a trial court *considers* the factors in its decision whether to revoke a community supervision, a court is not required to weigh the factors in any particular manner." *Id.* (emphasis added).

Implicit in *Bryant* is the notion that there must be *some* evidence of each of the six factors enumerated in article 42.037(h) for the trial court to *consider*. *See id.* (providing that article 42.037(h) requires neither that the trial court render findings nor that revocations be conditioned on the quantity or quality of evidence adduced as to the enumerated factors). Our reading of article 42.037(h), as illuminated by *Bryant*, is further supported by the use of the conjunctive "and" between the fifth and sixth factors, which leads us to believe that there must be at least *some* evidence (e.g., a "quantity") of each of the six factors. *See Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991) (providing that we must focus our attention on the literal text of the statute in question and

12

attempt to discern the fair, objective meaning of that text at the time of its enactment).   It would be absurd to think that the Texas Legislature provided that trial courts "shall consider" factors on which they might be presented no evidence.   We think that the Texas Legislature intended trial courts to consider *evidence* relating to each of the six factors not *nothing* relating to each of the six factors.

### 3.     Analysis

Applying the article 42.037(h) factors to the facts of this case, we find:

(1) *the defendant's employment status*:

- Carreon testified that it was difficult for him to gain steady employment due to lack of transportation, employers' reluctance in hiring a convicted felon, and the interference of monthly probation meetings;

- he mows neighbors' yards for $20 a yard, occasionally works with his father and uncle, for $100 a week, worked in an oil field until his criminal history was discovered, and worked at a fast-food restaurant until laid off;

(2) *the defendant's current and future earning ability*:

- Carreon testified that he earned a "degree" in "computer accounting" from a vocational school, but has been unable to find employment in that field; his criminal history has made it difficult to find employment in general and specifically utilizing his "degree;" he did not suffer from any physical disabilities and was capable of performing manual labor, such as mowing neighbors' yards;

(3) *the defendant's current and future financial resources*:

- Carreon's current financial resources are limited; after the motion to revoke was filed, Carreon's family pooled together $2,000; in light of the total amount of restitution, this represents less than ten percent of what was owed; Carreon also owes an approximately $17,000 student loan debt;

- there was no non-speculative evidence as to Carreon's future resources;

(4) *the willfulness of the defendant's failure to pay*:

- There was no non-speculative evidence that Carreon was not diligent in pursuing employment; Carreon testified that he placed applications but did not receive many job offers;

(5) *any other special circumstances that may affect the defendant's ability to pay*:

- As the father of three and the main financial provider, Carreon asserts that the community-supervision order placed conflicting requirements on him— provide for his family and make restitution;

(6) *the victim's financial resources or ability to pay expenses incurred by the victim as a result of the offense*:

- The State neither called the victim to provide live testimony nor offered any affidavit testimony from the victim regarding his or her financial resources or ability to pay expenses incurred by the victim as a result of the burglary;

On this record, the State failed to present any evidence regarding the sixth factor. Thus, the trial court had no evidence of the victim's financial resources or ability to pay expenses incurred by the victim as a result of the offense as required by the statute. Additionally, the trial court appears to have placed significant weight on the fourth factor, finding that Carreon was willfully unemployed "and/or" underemployed. The only possible evidence that may be surmised from the record are the trial court's questions to Carreon directly. As noted above, the trial court questioned Carreon on why he did not get a job within two miles of his home "picking onions" in order to pay restitution. The trial court's line of questions assumes that (1) the one[8] "onion field" within two miles of Carreon's home was hiring employees, (2) Carreon would be hired, (3) the "onion field job" would be permanent or regular, and (4) Carreon would earn sufficient wages to allow him to pay approximately $24,000 in restitution. The trial court's finding of willful unemployed "and/or" underemployed also seems rooted in Carreon earning a "degree" in

---

[8] Carreon acknowledged only one field within two miles of his home.

14

"computer accounting" for a vocational school. It noted, "I didn't have any testimony he missed school." This observation speculates that the vocational school required physical attendance as opposed to offering an online curriculum.

The trial court's conclusions, based on assumptions not supported by the evidence, reminds us of the "test" rejected by the Fourth Court of Appeals in *Amezcua v. State*, 975 S.W.2d 688, 691 n.1 (Tex. App.—San Antonio 1998, no pet.). There, the State argued that the probationer should have owned a used car instead of a newer model and bought cheaper clothes in order to pay more in restitution. *Id.* The appellate court concluded that to require a probationer to "forgo transportation and personal grooming and yet still get a job that would enable her to make a substantial monthly payment" is a "test" which the court was not prepared to require of probationers to avoid revocation. *Id.* The finding of willfulness was not supported by the evidence.

We conclude that the State presented legally insufficient evidence as to the sixth factor. Furthermore, the trial court's finding of willful "unemployment and/or underemployment" is not supported by legally sufficient evidence. Thus, a third of the factors were completely absent. The trial court abused its discretion in finding that the balance of the article 42.037(h) factors supported revocation because the record presented by the State was insufficient.

Carreon's first sub-issue is sustained.

B. **Sub-Issue Two: The Constitutional Challenge**

Our analysis of the article 42.037(h) factors to the facts of this case disposes of the restitution ground but not the revocation grounds related to failure to pay community

supervision fees, fines, and court costs. Therefore, we must address Carreon's constitutional challenge. We would also note that even if the trial court had been presented with legally sufficient evidence of the article 42.037(h) factors or a trial court's assessment of those factors is not subject to a legal sufficiency challenge, revocation under the facts of this case does not withstand Carreon's constitutional challenge.

**1.      Applicable Law**

In *Bearden v. Georgia*, 461 U.S. 660, 672–73 (1983), the Supreme Court held,

> that in revocation proceedings for failure to pay a fine or restitution, a sentencing court must inquire into the reasons for the failure to pay. If the probationer willfully refused to pay or failed to make sufficient bona fide efforts legally to acquire the resources to pay, the court may revoke probation and sentence the defendant to imprisonment within the authorized range of its sentencing authority. If the probationer could not pay despite sufficient bona fide efforts to acquire the resources to do so, the court must consider alternate measures of punishment other than imprisonment. Only if alternate measures are not adequate to meet the State's interests in punishment and deterrence may the court imprison a probationer who has made sufficient bona fide efforts to pay. To do otherwise would deprive the probationer of his conditional freedom simply because, through no fault of his own, he cannot pay the fine. Such a deprivation would be contrary to the fundamental fairness required by the Fourteenth Amendment.

*Id.* (footnotes omitted). One Texas judge has observed that *Bearden* mandates a trial court inquiry into the reasons for failure to pay restitution and permits incarceration only when alternate measures are not adequate to meet the State's interests in punishment and deterrence. *See Gipson v. State*, 428 S.W.3d 107, 111 (Tex. Crim. App. 2014) (Alcala, J. concurring).

**2.      Analysis**

As noted above, the trial court's finding of willfulness, unaided by the State, is

supported by legally insufficient evidence. The trial court lamented that because Carreon's term of community supervision had lapsed, it could not consider alternate measures. But, as the Supreme Court pronounced, incarceration is only meant for situations where the *alternate measures* "are not adequate to meet the State's interest in punishment and deterrence." *Bearden*, 461 U.S. at 672. Here, the trial court was primarily concerned with the victim,[9] who made no appearance at the revocation hearing. There is no indication that making the burglary victim "whole" was part of the "punishment" or "deterrence" goals articulated by *Bearden*, a case dealing with restitution after a conviction for felony burglary and theft by receiving stolen property. *Id.* at 662, 672. We conclude that revocation on this record would violate Carreon's Fourteenth Amendment right prohibiting the State from revoking an indigent defendant's community supervision for failure to pay restitution, monthly community supervision fees, fines, court costs, and restitution. *Id.* at 672–73. Accordingly, the trial court abused its discretion by revoking Carreon's community supervision.

Carreon's second sub-issue is sustained.[10]

### III. CONCLUSION

We are not unmindful of Carreon's failure to comply with the terms and conditions of his community supervision. We recognize the numerous opportunities he has been given since being placed on deferred adjudication community supervision more than ten

---

[9] As the trial court was denying the State's motion to dismiss the motion to revoke, the trial court stated, "please put that on the record because I don't want the victim coming back at me because you choose not even to try the case . . . ."

[10] Because Carreon's second issue is dispositive, we need not address his other issues. *See* TEX. R. APP. P. 47.1.

years ago. That notwithstanding, the State's only allegation in the motion to revoke was appellant's failure to pay fees, costs, fines, and restitution. The State had the burden to prove appellant failed to do so. Here, the State conceded that it lacked evidence to proceed and filed a motion to dismiss the motion to revoke. Even viewing the evidence in the light most favorable to the trial court's ruling, we find the State failed to meet its burden of proof.

The judgment revoking Carreon's community supervision and sentencing him to confinement is reversed. Because Carreon's term of community has expired, a judgment discharging Carreon from community supervision is rendered.

LETICIA HINOJOSA<br>
Justice

Publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
11th day of January, 2018.